IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2005 Session

# VANESSA SIRCY v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

**Direct Appeal from the Circuit Court for Davidson County**
**No. 02C-768     Walter C. Kurtz, Judge**

**No. M2004-00405-COA-R3-CV - Filed May 3, 2005**

This is a breach of contract action involving employment with a government municipality. In this case, the defendant municipality offered the plaintiff a job as a dispatcher at an annual salary of approximately $30,000, and the plaintiff accepted the position. Meanwhile, the defendant underwent job reclassifications and salary restructuring. On the second day of the plaintiff's employment with the defendant, she was informed that she would be paid an annual salary of approximately $24,000. After working for approximately five and one-half months for the defendant, the plaintiff resigned, citing the uncertainty regarding whether the defendant would adjust her salary, as they had suggested. Following her resignation, the plaintiff brought this action. Following a bench trial, the trial court determined that the defendant had made promises of employment at a certain salary that induced the plaintiff to resign her position at her former employment, and the defendant had breached those promises. As a result, the trial court found that the plaintiff had suffered damages in the amount of $16,500. The defendant has appealed the judgment of the trial court. Because we conclude that the trial court erroneously calculated damages, we modify the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

J. Brooks Fox and John Kennedy, Nashville, Tennessee, for the Appellant, Metropolitan Government of Nashville and Davidson County, Tennessee.

Shelley I. Stiles and John A. Barney, Brentwood, Tennessee, for the Appellee, Vanessa Sircy.

# OPINION

## Factual Background and Procedural History

In March of 1998, Vanessa Sircy ("Ms. Sircy") began working at Vanderbilt Medical Center ("Vanderbilt") as a patient care technician. Sometime around the beginning of 2001, the Metropolitan Government of Nashville and Davidson County ("Metro") posted on-line a job opening for the position of "Fire/EMT Dispatcher" at a stated annual salary of $29,998. On or about January 14, 2001, Ms. Sircy applied for the position through an on-line application. Metro contacted Ms. Sircy, and she interviewed for the position with a panel of Metro officials, including Chief Mary Kathleen Whisenant ("Chief Whisenant"), the superintendent of communications who oversaw all dispatchers for the Fire Department and Emergency Medical Systems. Chief Whisenant telephoned Ms. Sircy a couple of weeks after the interview to inform Ms. Sircy that Metro intended to offer her the position, pending the successful completion of pre-employment testing. After Ms. Sircy passed these tests, Chief Whisenant again called Ms. Sircy to offer her the job as Fire/EMT Dispatcher, which she accepted.

In the meantime, however, Metro had commissioned a study regarding job classifications and salary structure (the "Mercer Study"). The findings of the Mercer Study were released in April of 2001. Based on the recommendations of the Mercer Study, new hires for the position of Fire/EMT Dispatcher were to be classified as "Emergency Telecommunicator One" ("ECO 1") and be paid a significantly lower salary than that paid to existing Fire/EMT Dispatchers. Existing Fire/EMT Dispatchers were grandfathered into the position of "Emergency Telecommunicator 3" ("ECO 3") and were given a significant increase in salary. The changes imposed as a result of the Mercer Study created a level of uncertainty within Metro regarding Ms. Sircy's prospective employment status. In addition to being uncertain whether Ms. Sircy would be hired as a Fire/EMT Dispatcher or as an ECO 1, Metro was unsure what salary she would be paid.

Despite the confusion surrounding Ms. Sircy's position, Chief Whisenant was directed by her immediate supervisor, Chief Poole, not to tell Ms. Sircy about the potential job reclassification. However, around this same time, Ms. Sircy met with Michelle Smith ("Ms. Smith"), an administrative assistant to Chief Poole, to complete some paper work. In her testimony, Ms. Smith stated that she told Ms. Sircy and other applicants at "a meeting" that the status of the job position was in doubt. However, Ms. Smith gave conflicting testimony regarding whether she told Ms. Sircy and the other applicants about a potential reduction in salary. Ms. Sircy testified that she could not remember any such meeting where she was informed by Ms. Smith about the confusion regarding the position and pay.

The changes imposed as a result of the Mercer Study took effect on the effective date Ms. Sircy was to begin her employment with Metro, July 1, 2001. The job reclassification eliminated the position of Fire/EMT Dispatcher, and that position was thereafter known as "ECO 3" and paid an annual salary of $37,200. After resigning from her job at Vanderbilt, Ms. Sircy began her employment with Metro on Monday, July 2, 2001. On her second day, Ms. Sircy discovered that she

had been hired as an ECO 1, rather than a Fire/EMT Dispatcher. In addition, she learned that she would not be paid the advertised salary of $29,998, but, instead, she would be paid an annual salary of $23,949, although she performed the same duties as those performed by an ECO 3. Metro was also unable to inform Ms. Sircy about the department's policy regarding salary increases for the position of ECO 1.

Soon after learning about the change in position and salary, Ms. Sircy attempted to have this matter resolved by speaking with different officials within Metro. She met with Chief Whisenant, and in response to Chief Whisenant's inquiry, Chief Poole stated that Ms. Sircy "could take it or leave it." Ms. Smith testified that she was *not* surprised that Ms. Sircy was upset because, as she stated in her testimony, "everybody thought they were going to be dispatchers." During that same time, Ms. Sircy contacted Kevin Neville, the union representative, who informed her that he could not represent her because she was not an employee of the Fire Department. She also e-mailed Chief Meador, a high ranking Chief within the department, who assured her that he would keep her apprised of her situation, but he never responded further. In the following weeks and months, Chief Whisenant consistently assured Ms. Sircy that officials within Metro were working towards resolving this matter.

After working approximately five and one-half months as an ECO 1, Ms. Sircy resigned from Metro on December 13, 2001. Her resignation letter provided as follows:

> Please accept this as my resignation from my position with the Nashville Fire Department. Due to the events that took place after I was hired[,] concerning my position and salary, I am unable financially to continue with the department. Since no decisions have been made about my pay or about the current scale I am working under, I am also unable to make an informed decision about my future situation.
>
> /s/ Vanessa D. Sircy 12/13/01

After resigning from Metro, Ms. Sircy was able to obtain the same position she once held at Vanderbilt. However, because she took the job with Metro and left Vanderbilt, she lost the benefits she once enjoyed as senior member in her department. She was required to work weekend and holiday shifts for a year, where she once enjoyed preference in scheduling. Additionally, her new position with Vanderbilt was for fewer hours per week and provided less opportunity to work overtime shifts. She also missed one scheduled pay increase due to taking the position with Metro. Finally, Ms. Sircy lost the three and one-third years of credit which she had accrued towards education benefits at Vanderbilt University.[1]

On March 19, 2002, Ms. Sircy filed her complaint. Following a bench trial, the trial court entered a thirteen page memorandum and order finding that Metro had breached its promise of

---

[1] Ms. Sircy testified that once an employee had worked at Vanderbilt for five years, Vanderbilt would pay for one-hundred (100%) percent of both the employee's and the employee's children's college tuition.

employment to Ms. Sircy. In its order, the trial court found that "[Metro] offered Ms. Sircy a definite job with a definite pay under circumstances that it should have known would cause her to detrimentally change her employment with Vanderbilt." The trial court went on to state that "[Metro] breached its promise to Ms. Sircy and must be responsible to her for contract damages." The trial court awarded Ms. Sircy $16,500 in damages, and, from this order, Metro appeals.

On appeal, Metro presents the following issues, as restated, for our review: (1) whether the trial court erred by finding Metro liable for breach of "contract by estoppel" or "implied contract," and (2) whether the trial court erred in its calculation of damages.

## Standard of Review

In matters tried by a judge sitting without a jury, we review the trial court's findings of fact *de novo* upon the record, accompanied by a presumption of correctness. Tenn. R. App. P. 13(d)(2004). Those findings of fact will be affirmed unless contradicted by a preponderance of the evidence. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). Where the trial court's factual conclusions rest on the evaluation of a witness's credibility, we will not re-evaluate that assessment of witness credibility absent clear and convincing evidence to the contrary. *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). However, we review a trial court's conclusions on questions of law under a pure *de novo* standard, and no presumption of correctness attaches to such conclusions. *Bowden v. Ward,* 275 S.W.3d 913, 916 (Tenn. 2000).

## Contract Liability of Metro

The parties frame the issues in terms of promissory estoppel. However, after reviewing the facts alleged in the complaint, we are satisfied that the gravamen of the complaint states a cause of action for breach of contract. Further, the evidence presented at trial demonstrates that this is a breach of contract action.

In this case, the following facts are essentially undisputed. Metro advertised the opening for the Fire/EMT Dispatcher position at a salary of $29,998 per year. Ms. Sircy interviewed for that position. She was offered the Fire/EMT Dispatcher job, and she accepted. After she arrived at her new job, she was informed that she would not be paid the salary she had been promised. In order to take the position at Metro, Ms. Sircy resigned her position with Vanderbilt, thus forfeiting a number of accrued benefits. The trial court found that Metro had breached its promise to Ms. Sircy and, as a result, should be liable for contract damages.

Based on its theory that this is purely an "estoppel" or "implied contract" case, Metro argues that it cannot be held liable under an estoppel theory because it did not take "affirmative action that clearly induced [Ms. Sircy] to act to her detriment." *See Bledsoe County v. McReynolds*, 703 S.W.2d 123, 125 (Tenn. 1985). Metro relies almost exclusively on the testimony of Ms. Smith for its argument that Ms. Sircy was not "clearly induced" to take the position. Ms. Smith testified that, prior to beginning her employment, Ms. Sircy was informed about the possibility of a job

reclassification. However, in our review of Ms. Smith's testimony, she appears to give conflicting answers regarding whether she informed Ms. Sircy about the change in salary. At one point, Ms. Smith testified that she communicated to Ms. Sircy and the other applicants that Metro was "not sure" about the pay change, and "it could be this at this salary or this at this salary." However, despite the foregoing testimony, she later stated, "I didn't tell them the salary one way or the other. The position, I did." Metro contends that any inducement to leave Vanderbilt and take the position with Metro was negated by the statements of Ms. Smith to Ms. Sircy and the other applicants.

After hearing the testimony of the witnesses, the trial court found that Ms. Sircy was not informed of the change in position and salary until *after* she began her employment with Metro. In its memorandum and order, the trial court found that Ms. Smith's testimony did not change this finding. As the trial court explained:

> while Ms. Smith may have stated that there was some confusion about the job description, there was no mention about a change in pay nor any mention about a change in responsibility. Whatever Ms. Smith's statements were, they were not sufficiently definite to put Ms. Sircy on notice that her pay or responsibilities were going to be changed after she reported to work.

There is disputed testimony in the record regarding whether and to what extent Ms. Sircy was informed about the changes prior to taking the job at Metro. In addition, there is ample evidence to show that she was not so informed. Therefore, upon review of the record, we conclude that the evidence does not preponderate against the trial court's findings. Accordingly, we affirm the trial court's conclusion that Metro is liable to Ms. Sircy for breach of contract.

### Damages

Having determined that Metro is liable for breach of contract, we turn to the issue of damages. In its memorandum and order, the trial court stated that it was approaching the award of damages as if this was a case involving the wrongful termination of an at-will employee. In so doing, the trial court awarded Ms. Sircy $6,500 for "back pay" and $10,000 for "front pay," for a total award of $16,500. Our research, however, has revealed no authority for such a "hybrid" approach to an award of damages. In our opinion, this is a breach of contract case. Accordingly, we will review the trial court's damages award in view of that determination.

Metro first insists that the trial court erred by not measuring damages by the amount of unjust enrichment to Metro. Metro contends that, if damages were measured by the amount that Metro was unjustly enriched, Ms. Sircy has suffered no damages because Metro paid Ms. Sircy the market rate for her services. In support of its argument, Metro relies primarily on the cases of *City of Lebanon v. Baird*, 756 S.W.2d 236 (Tenn. 1988) and *Brown v. City of Manchester*, 722 S.W.2d 394 (Tenn. Ct. App. 1986).

Metro contends that *Baird* stands for the proposition that, in determining the appropriate damages remedy in cases involving municipalities, the law distinguishes between whether the contract was performed or in the executory stage. We disagree with Metro's interpretation of *Baird*. First, the guiding issue in *Baird* involved a determination of whether the City of Lebanon's act of contracting with the defendant was *ultra vires*. *Baird*, 756 S.W.2d at 243–44. It was only in the context of this discussion involving *ultra vires* contracts that the court addressed the distinction between executory contracts and performed contracts. *Id*. In the case at bar, there is no issue as to whether the act of hiring Ms. Sircy was *ultra vires*, and we think this fact alone distinguishes *Baird* from this case. Further, the *Baird* court was determining whether an estoppel could be applied under the facts of that case, but at no point in that discussion did the court state that the appropriate remedy should be based on a theory of unjust enrichment. *See id*. at 245.

Metro also contends that the trial court misapplied the case of *Brown v. City of Manchester*. *See Brown*, 722 S.W.2d at 394. In *Brown*, the plaintiff sued the city seeking the recovery of certain overtime compensation, which the mayor had allegedly offered through a letter circulated through the various city departments. *Id*. at 395. The trial court in *Brown* granted the City of Manchester summary judgment on the theory that the plaintiff could not recover because the mayor was without authority to bind the city under the facts of that case. *Id*. at 396. Thus, *Brown* also involved an *ultra vires* action by a government official, and is thus distinguishable on that fact alone. However, in vacating the summary judgment, this Court merely recognized that, despite *ultra vires* conduct and the lack of an express contract, a city may be held liable under theories of *quantum meruit* or estoppel. *Id*. at 397. In *Brown*, we made no pronouncement, as Metro suggests, that the appropriate remedy, in all cases similar to the one before us, is damages based on a theory of unjust enrichment.

Turning to the case at bar, in its award of $6,500 for "back pay," the trial court described that amount as "[t]he difference between what the plaintiff was promised and what she received for the five (5) months she worked." The record reflects, however, that this amount represents the difference in pay between what an ECO 1 and an ECO 3 earned under the newly imposed salary structure. Ms. Sircy was promised and accepted the position of Fire/EMT Dispatcher at the salary rate of $29,998 per year, not the figure of $37,200, which the position of ECO 3 received after the Mercer Study changes went into effect. Therefore, Ms. Sircy's damages for back pay should be calculated based on the salary to which she agreed to accept the position, $29,998. For approximately twenty-four weeks, Ms. Sircy worked at the pay rate of $23,949, earning $11,053.44. If she had been paid at the salary of $29,998, she would have earned $13,845.10 in those twenty-four weeks. Thus, the difference between what Ms. Sircy was promised and what she received was $2,971.68, rather than the $6,500 figure arrived at by the trial court.

In addition to its award of "back pay," the trial court awarded Ms. Sircy $10,000 in "front pay." In determining this figure, the trial court merely stated that it was applying the criteria set forth in *Sasser v. Averitt*, 839 S.W.2d 422, 433–34 (Tenn. Ct. App. 1992). *Sasser* is a retaliatory discharge case and, as we alluded to above, has no application to this breach of contract case. As heretofore stated, Metro breached the contract with Ms. Sircy and she is entitled to recover damages

resulting from that breach, which would not include "front pay." Therefore, we modify the judgment of the trial court to reflect that Ms. Sircy suffered damages in the amount of $2,971.68.

## Conclusion

For the foregoing reasons, we affirm the trial court's judgment as modified. Costs of this appeal are taxed equally between the Appellant, The  Metropolitan Government of Nashville and Davidson County and its surety, and the Appellee, Vanessa Sircy.

                  _____

                  DAVID R. FARMER, JUDGE